UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHERYL D'ANNE MOORE,            )
                                )
            Plaintiff,          )
                                )
      vs.                       )      No. 4:05-CV-2198 CEJ
                                )
LINDA S. MCMAHON[1],            )
Commissioner of Social Security,)
                                )
            Defendant.          )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

I.  **Procedural History**

On March 1, 2004, plaintiff Sheryl D'Anne Moore filed an application for a period of disability, disability insurance, and supplemental security income (SSI) benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., 1381 et seq., claiming that she had been unable to work since January 17, 2004. Plaintiff claimed disability based on pain and swelling in her right knee and leg, which made it difficult for her to stand, walk, lie down, and sit. (Tr. 61, 66, 67). Plaintiff's application was denied on initial consideration, (Tr. 26-30), and

---

[1] Linda S. McMahon became the Acting Commissioner of Social Security on January 20, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Linda S. McMahon should be substituted, therefore, for Commissioner Jo Anne B. Barnhart as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 33).

An administrative hearing was held on June 27, 2005. (Tr. 140-159). The ALJ issued a decision on July 28, 2005, denying plaintiff's claim. (Tr. 8-16). The Appeals Council denied plaintiff's request for review on September 28, 2005. (Tr. 3-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g). Plaintiff proceeds before this Court *pro se.*

**II. <u>Evidence Before the ALJ</u>**

Plaintiff, who was then represented by counsel, was the sole witness at the June 27, 2005 hearing. She testified that she was fifty-four years old, widowed[2], and that she lived with John Crandall, a long-time friend. (Tr. 141). Plaintiff had no minor children. (Tr. 141).

In 1980, plaintiff enlisted in the United States Air Force. (Tr. 142). During a training exercise on the "confidence course," she injured her right knee; doctors later told her she had a fractured kneecap and placed her leg in a cast. (Tr. 143). She testified that she ultimately received a medical discharge. (Tr. 143). Plaintiff told a doctor in 2005 that her knee had not posed problems for her for many years. (Tr. 118).

Plaintiff testified that her knee began causing her pain again in July 2003. (Tr. 144). She said nothing in particular had

---

[2] Plaintiff was divorced in 1976; her ex-husband died in 1999. (Tr. 37, 141).

2

prompted the resurgence of the pain, which "just started on its own." (Tr. 145). She rubbed her right leg with alcohol and witch hazel three to five times daily, which effectively reduced the swelling. (Tr. 66, 145). When her leg began to swell again in October 2003, she successfully repeated the same treatment with alcohol and witch hazel. (Tr. 145). Plaintiff testified the swelling increased when she performed household chores such as laundry, mopping, and dusting. (Tr. 146).

Plaintiff testified that in January 2004, her right knee swelled "so big" and gave her "so much pain that I couldn't walk on it anymore." (Tr. 144). She testified that she lay in bed and elevated her knee for the following two months. (Tr. 144). In February 2005, her "right leg just gave out," and she fell, injuring her leg. (Tr. 151). Plaintiff said it was the only time her knee injury caused her to fall. (Tr. 151). Plaintiff reported losing sleep because she had to awaken to take pain pills during the night. (Tr. 151). She testified that the swelling in her knee had not abated as of the date of the hearing, and that she was "in pain all of the time." (Tr. 145).

Plaintiff testified that her knee pain limited her ability to perform daily tasks. (Tr. 154). She cooked meals that did not require much walking and standing; she shopped for groceries but had difficulty standing while shopping and bending down to reach

items on lower shelves; and she attended church but sat with her knee extended, not bent.[3] (Tr. 154-55).

Plaintiff sought medical treatment in January 2004 from SSI doctors. (Tr. 157). On April 14, 2004, disability examiner Shani Greenberg diagnosed plaintiff with osteoarthrosis[4] and allied disorders, but found she was not disabled. (Tr. 24).

On April 27, 2004, plaintiff requested reconsideration of the finding she was not disabled. (Tr. 31). On the request form, plaintiff wrote her right leg "feels like a heavy piece of lead by the end of the day" and her knee was "swollen and painful from the moment I arise, thru the day & night, and also as I sleep." (Tr. 31).

After SSI denied plaintiff benefits, she sought treatment at St. Louis ConnectCare and was treated by Dr. Kiefer and Dr. London. (Tr. 149).[5] Plaintiff was prescribed 800 milligrams of ibuprofen for pain. (Tr. 149). She began taking one ibuprofen a day in May

---

[3] The Court notes that this testimony conflicts with plaintiff's statements in the Pain Questionnaire she completed in March 2004, when she asserted: " I haven't done any shopping since I was unable to work," and "I haven't been preparing any meals since I was unable to work." (Tr. 69, 153-54). In her application, she claimed she was able to do laundry and dishes, make the bed, and iron, and her testimony at the hearing was consistent with these statements. (Tr. 69, 152-53).

[4] Osteoarthrosis is synonymous with osteoarthritis, which is arthritis characterized by erosion of cartilage, which becomes soft, frayed, and thinned, resulting in pain and loss of function. Osteoarthrosis is also synonymous with degenerative arthritis and degenerative joint disease. See PDR Med. Dict. 1282 (2d ed. 2000).

[5] St. Louis ConnectCare is spelled phonetically in the hearing transcript as "Kinetcare".

2004, but by the winter of 2004, she increased her dosage to two to three ibuprofen tablets a day. (Tr. 149).

Plaintiff testified that her doctor told her the pain was caused by three tears in her knee, one of which could possibly be corrected through surgery. (Tr. 150). He recommended physical therapy to strengthen plaintiff's right leg and knee, followed by surgery if necessary. (Tr. 150). Dr. Kiefer recommended that she elevate her leg periodically. (Tr. 155). Plaintiff testified that she wore a knee brace given to her by her sister, and the brace helped her walk. (Tr. 150).

On a form she completed April 27, 2004 while appealing the adverse disability determination, plaintiff wrote that she had felt "very stressed out" and "deeply depressed" since her visit with the doctor. (Tr. 82).

Plaintiff testified that during the fifteen years prior to the hearing, she had worked as a tax preparer, cashier, and waitress or server. (Tr. 147-48). From 1993 to 2004, she worked as a Certified Nurse's Assistant (CNA) in a nursing home, and then as a home health aide. (Tr. 143-44). Plaintiff stopped working in January 2004 because of the pain in her knee. (Tr. 144). She sought medical treatment, then applied for unemployment benefits in June 2004. (Tr. 157).

Plaintiff testified that she could not return to work as a cashier or server because the jobs involved "a lot of bending and a lot of standing." (Tr. 148). She said following a period of

standing, she needed to rest and elevate her leg for thirty minutes to reduce pain and swelling in her knee. (Tr. 148).

Plaintiff testified that she searched for a job at least once or twice a week after she stopped working as a home health aide in January 2004. (Tr. 156). She could not look for work for more than two days in a row because walking would make her knee swell and hurt. (Tr. 156). Plaintiff testified that she knew that when she did get a job, her knee was "going to swell up again where I'm going to have to take off," because she would not "be able to walk on it." (Tr. 156). She said her lack of a car aggravated her knee condition, because she had to walk to the bus stop. (Tr. 156). Finally, plaintiff also testified that she believed that knee surgery and weekly physical therapy sessions would interfere with her ability to go to work. (Tr. 158).

### III. Medical Evidence

#### A. Medical Evidence Presented to ALJ

On June 10, 1980, plaintiff visited John Parham, M.D., an Air Force doctor, claiming she had pain in her knee due to trauma on the confidence course. (Tr. 96). Dr. Parham diagnosed a lateral meniscus tear[6] on plaintiff's right knee, prescribed Motrin for pain, and referred her for an x-ray and orthopedic consultation. (Tr. 96). Later that day, Dr. James Harland, an Air Force orthopedic surgeon, examined plaintiff, diagnosed pre-patellar

---

[6] Lateral means on the side. See PDR Med. Dict. 969, 1076 (2d ed. 2000). Meniscus is a crescent-shaped fibrocartilage found in the knee. See PDR Med. Dict. 997 (2d ed. 2000).

bursitis[7], and prescribed a cast for her leg. (Tr. 97). Plaintiff told SSI disability counselor Shani Greenberg in April 2004 that she had been in the cast for six to eight weeks during the summer of 1980 and used a cane or crutches for about three months thereafter. (Tr. 100).

Plaintiff's initial medical evaluation pursuant to her Social Security application was conducted by Llewellyn Sale, Jr., M.D., at the Forest Park Medical Clinic on April 6, 2004. (Tr. 100). Plaintiff reported that she had had pain and swelling in her right knee in July and October of 2003 and in January 2004. (Tr. 100). Plaintiff complained that she could only be on her feet for an hour or so at a time, could not squat, and "could bend her knee, but not completely." (Tr. 100-101). She reported that she could walk a half block, but found climbing the twelve steps at her house very painful. (Tr. 100).

Dr. Sale observed that plaintiff's right knee was "obviously larger" than the left and measured 3.5 cm greater in circumference. (Tr. 101). Dr. Sale observed local heat without erythema[8] and tenderness over the medial and lateral aspects of the joint and over the patella.[9] (Tr. 101). He further found that there was

---

[7] The patella is the kneecap. See PDR Med. Dict. 1331 (2d ed. 2000). Pre-patellar refers to the front of the kneecap. Id. at 1440. Pre-patellar bursitis is also known as housemaid's knee, a condition which occurs over the area of contact when kneeling. Id. at 952.

[8] Erythema is redness due to capillary dilation. See PDR Med. Dict. 615 (2d ed. 2000).

[9] Medial means relating to the middle or center, and lateral means on the side. See PDR Med. Dict. 969, 1076 (2d ed. 2000).

crepitation on movement of the knee joint.[10] (Tr. 101). Dr. Sale noted that lateral and medial movement of the knee joint caused plaintiff pain and some instability. (Tr. 101). He noted that plaintiff's gait had a marked limp, that her right knee was stiff, and that she could not walk on heels or toes and was unable to squat. (Tr. 101-102). Dr. Sale's clinical impression was post-traumatic condition of right knee with instability, effusion[11], degenerative changes and possible meniscus or ligament change[12]. (Tr. 102).

An x-ray taken on May 20, 2004, revealed evidence of a minimal bone spur at the edge of plaintiff's patella.[13] (Tr. 126). The x-ray also showed a calcified 2 x 3 mm loose body in the joint space. (Tr. 126). The diagnosis was minimal osteoarthritis of the right knee with a calcified loose body in the joint space. (Tr. 126).

On July 8, 2004, plaintiff visited Dr. London, an orthopedist at St. Louis ConnectCare, complaining of swelling and pain in her

---

[10] Crepitation means crackling or the quality of a fine bubbling sound that resembles noise heard on rubbing hair between the fingers. See PDR Med. Dict. 423 (2d ed. 2000).

[11] Effusion is the escape of fluid from the blood vessels or lymphatics into the tissues or a cavity; or the collection of the fluid effused. See PDR Med. Dict. 570 (2d ed. 2000).

[12] Meniscus is a crescent-shaped fibrocartilage found in the knee; ligament is a band or sheet of fibrous tissue connecting two or more bones, cartilages, or other structures, or serving as support for fasciae or muscles. See PDR Med. Dict. 997 (2d ed. 2000). Fasciae is a sheet of fibrous tissue that envelops the body beneath the skin and encloses muscles. Id. at 647.

[13] A bone spur is also known as an osteophyte, which is a bony outgrowth or protuberance. See PDR Med. Dict. 1285 (2d ed. 2000).

knee and saying she could not walk. (Tr. 114). Dr. London noted there was crepitation under the patella and recommended another x-ray. (Tr. 114). He prescribed 400 mg of ibuprofen to be taken twice daily. (Tr. 114). On September 8, 2004, plaintiff complained of swelling in her knee, and the doctor recommended an MRI (magnetic resonance imaging) be done on plaintiff's knee. (Tr. 115).

The MRI was performed on October 28, 2004. Yuming Yin, M.D., interpreted the MRI and diagnosed plaintiff with mild to moderate osteoarthritis of the right knee. (Tr. 119). Dr. Yin also noted two small radial tears of the meniscus and a partial tear of the anterior cruciate ligament.[14] (Tr. 120).

Plaintiff visited the Myrtle Hilliard Davis Comprehensive Health Centers on November 4, 2004, complaining of knee pain and tenderness. (Tr. 123). T. Cometa, M.D. diagnosed degenerative joint disease in plaintiff's right patella and prescribed ibuprofen. (Tr. 123). On February 16, 2005, plaintiff complained to a doctor at ConnectCare that she had injured her knee in 1980, did well for many years, and then had experienced intermittent pain and swelling since July 2003. (Tr. 118). Doctors prescribed glucosamine and chondrolin, ibuprofen to be taken three times a day, and some bed rest. (Tr. 118, 124).

---

[14] Anterior means on the front. See PDR Med. Dict. 94 (2d ed. 2000). Cruciate means shaped like or resembling a cross. Id. at 429.

Dr. Cometa at the Davis Health Center noted on May 4, 2005 that plaintiff complained of pain and tenderness in the right knee due to osteoarthritis and a former knee fracture. (Tr. 124-25). Dr. Cometa referred plaintiff to the orthopedic department at St. Louis ConnectCare. (Tr. 125). On June 10, 2005, plaintiff's ibuprofen prescription was renewed. (Tr. 125).

### B. Additional Medical Evidence

Along with her brief, plaintiff submitted to the Court a copy of discharge instructions from Barnes-Jewish Hospital. The document indicates that plaintiff was admitted on February 17, 2006 and discharged on February 21, 2006. The document shows that plaintiff was prescribed famotidine (to reduce stomach acid), flagyl (for infection), bismuth (for diarrhea), tetracycline (to prevent infection), oxycodone (for pain), colace (for constipation), and aspirin (for blood-thinning). Plaintiff was instructed to return for a follow-up appointment at the General Surgery Clinic on February 28, 2006. The document does not indicate the type or purpose of the surgery. In a letter dated February 23, 2006, plaintiff stated that she "ended up in the hospital with my knee swollen too large to work and in too much pain, and had to have surgery in another area."

Plaintiff also submitted a copy of a paycheck stub for the pay period January 30, 2006 to February 14, 2006. Plaintiff contends that this document shows that she had returned to work. She noted, however, that she had "had to stop work because of surgery."

### IV. ALJ's Decision

Administrative Law Judge Thomas C. Muldoon presided at plaintiff's administrative hearing. The ALJ made the following findings:

1. The claimant meets the disability insured status requirements of the Act at least through the date of this decision.

2. The claimant is not a fully credible witness about her limitations.

3. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

4. The medical evidence establishes that the claimant has severe impairment of osteoarthritis of the knee.

5. Under the special technique for evaluating mental impairments, 20 C.F.R. §§ 404.1520a, 416.920a (2005), the undersigned finds that the claimant has non-severe depression that does not satisfy the diagnostic criteria of Part A of a listing. In addition, the claimant's mental impairment does not meet the Part B criteria. She has no limitations of activities of daily living; social functioning; and concentration, persistence, or pace. The claimant has no episodes of decompensation within one year, each lasting for at least two weeks. She does not have a mental impairment that meets the Part C criteria.

6. The claimant does not have an impairment or combination of impairments that meet or equal a listing.

7. The claimant has the maximum residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit, stand, and walk for six hours. 20 C.F.R. §§ 404.1545, 416.945 (2005).

8. The claimant can perform her past relevant work.

9. The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision. 20 C.F.R. §§ 404.1520(e), 416.920(e) (2005).

(Tr. 8-15).

**V. Discussion**

To be eligible for Disability Insurance benefits, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2006). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2006).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u>, 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's

impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A. **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145,1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;
2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B. **Plaintiff's Allegations of Error**

Plaintiff raises two issues before the Court: (1) she claims the ALJ erred in determining plaintiff was not a credible witness regarding her limitations, and (2) plaintiff maintains she is disabled under the Medical-Vocational Guidelines.

#### 1. **Credibility Determination**

Plaintiff challenges, without elaboration, the ALJ's finding that she was not a fully credible witness about her limitations. The ALJ wrote, "The absence of objective medical evidence to support the degree of severity of subjective complaints alleged" was one factor the ALJ must consider to evaluate plaintiff's

14

credibility. (Tr. 13). The ALJ also considered all the evidence presented "that relates to subjective complaints," including the claimant's prior work record and "observations by third parties and treating and examining physicians that relate to: the claimant's daily activities; the duration, frequency, and intensity of symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; treatment, other than medication, for relief of symptoms; and functional restrictions." (Tr. 13). Finally, the ALJ noted he had authority to "discount the claimant's subjective complaints if there are inconsistencies in the evidence as a whole." (Tr. 13).

The Court finds that, in his assessment of plaintiff's credibility and alleged disability, the ALJ considered the correct factors, as set forth in 20 C.F.R. § 404.1529 (2006), 20 C.F.R. § 404.929 (2006), and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The ALJ found that although plaintiff "had some limitations on her ability to perform daily activities," she admitted that she laundered, washed dishes, made the bed, and ironed. (Tr. 13). These activities were "not completely consistent with her allegations about her symptoms and limitations." (Tr. 13). As of the hearing date, she had a prescription for 800 mg of ibuprofen and reported that the medication helped. (Tr. 13).

The ALJ further found that plaintiff's treating and evaluating physicians "noted her knee was stable" and diagnosed "mild to moderate" or "minimal" osteoarthritis of the knee. (Tr. 13). While the ALJ conceded that the plaintiff "has an abnormality of her

15

knee," he concluded that the medical records "do not reveal that it limits her as severely as" she alleged. (Tr. 14). Finally, the ALJ found that plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently. (Tr. 14). She could sit, stand, and walk for six hours. (Tr. 14). In making this determination, the ALJ noted, he considered "the impact of the claimant's pain and other symptoms to the extent [the ALJ] found the claimant credible in her statements about her pain and other symptoms." (Tr. 14).

An ALJ's credibility determination is "entitled to considerable deference." Dilling Mech. Contractors, Inc. v. Nat'l Labor Relations Bd., 107 F.3d 521, 524 (7th Cir. 1997) (citations omitted), cert. denied, 522 U.S. 862 (1997). "Great weight is afforded the credibility determination of the ALJ, as he or she had the opportunity to observe the witnesses testify." Nat'l Labor Relations Bd. v. Horizons Hotel Corp., 49 F.3d 795, 799 (1st Cir. 1995), supplemented by In re: Horizons Hotel Corp., 320 NLRB 1113 (N.L.R.B. Mar. 29, 1996), rev. denied and enforced, Horizons Hotel v. N.L.R.B., 114 F.3d 1169 (1st Cir. 1997). "If an ALJ discredits testimony and explicitly gives good reasons for so doing," the Court is bound by that judgement, unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (citations omitted).

The ALJ considered the plaintiff's subjective complaints relating to her impairment and found the plaintiff was not fully credible with regard to her limitations. The ALJ fully considered

16

the medical evidence and third-party corroboration of the plaintiff's impairments. The Court finds that the ALJ's decision was not based on legal error, and there is substantial evidence in the record as a whole to support to conclusion that plaintiff was not disabled.

   2.   **Disability Determination**

The vocational factors the Court considers are listed in 20 C.F.R. § 404, Subpart P, App. 2 (2006). Vocational factors include age, education, and work experience, which the Court analyzes in combination with the individual's residual functional capacity. Id. The plaintiff was fifty-four years old at the time of the hearing. She graduated from high school, attended the St. Louis College of Health Careers, and was a certified nurse's assistant. She had worked as a tax preparer, server, cashier, and nurse's assistant in the fifteen years preceding the hearing. The ALJ considered the foregoing at the hearing. (See Tr. 141, 142, 147). The ALJ found plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently, and to stand, sit, and walk for six hours. He then found plaintiff could perform her past relevant work. The ALJ found that there was no objective medical evidence in the record to support plaintiff's claim of being depressed, and noted plaintiff did not testify about her alleged depression at the hearing. The Court finds there is substantial evidence in the record as a whole to support the ALJ's conclusion that the claimant is not disabled.

### V. Conclusion

The Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint and her brief in support of the complaint is **denied.**

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 9th day of February, 2007.